**JEANNETTE RANKIN BRIGADE et al.,**
Appellants,

v.

**CHIEF OF THE CAPITOL POLICE**
et al., Appellees.

No. 21566.

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 9, 1968.
Decided June 20, 1969.

Miss Harriet Van Tassel, Newark, N. J., with whom Messrs. Joseph Forer and

William M. Kunstler, New York City, were on the brief, for appellants.

Mr. Alan S. Rosenthal, Attorney, Department of Justice, with whom Asst. Atty. Gen. Edwin L. Weisl, Jr., at the time the record was filed, Messrs. David G. Bress, U. S. Atty. at the time the record was filed, and Ralph A. Fine, Attorney, Department of Justice, were on the brief, for appellees. Messrs. Frank Q. Nebeker, Asst. U. S. Atty. at the time the record was filed, Joseph M. Hannon and Gil Zimmerman, Asst. U. S. Attys., and Morton Hollander, Attorney, Department of Justice, also entered appearances for appellees.

Messrs. Richard Shlakman and Lawrence Speiser, Washington, D. C., filed a brief on behalf of American Civil Liberties Union and National Capital Area Civil Liberties Defense and Education Fund, as amici curiae, urging reversal.

Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and BURGER,* Circuit Judge.

FAHY, Senior Circuit Judge:

The appellant Brigade was an ad hoc group of some 5000 ladies who, together with 58 plaintiffs as individuals, gathered in Washington January 15, 1968, the opening day of Congress, to march in a body from Union Station to the Capitol, and there to assemble across the East Front Plaza. This demonstration was to be in protest against the country's involvement in Vietnam. On January 2, 1968, the Chief of the Capitol Police, an appellee, had advised their representative that to march in this manner was prohibited by 40 U.S.C. § 193g (9 D.C. Code § 124), set forth in the margin.[1] The ladies were also advised, as hereinafter set forth more fully, how they might proceed without interference. This was unacceptable. They accordingly filed suit in the District Court to enjoin appellees, including the Chief of the Capitol Police, from enforcing Section 193g against them and members of their class, as he threatened to do. They alleged that Section 193g was repugnant to the First Amendment "right of the people peaceably to assemble, and to petition the Government for a redress of grievances." They moved for the convening of a three-judge court pursuant to 28 U.S.C. §§ 2282 and 2284, and also requested a judgment declaring 40 U.S.C. § 193a et seq. (9 D.C.Code § 118 et seq. See note 1, supra.) to be unconstitutional. The District Judge, deeming the constitutional question to be insubstantial, denied the motion for a three-judge court. In the same order he also denied all injunctive relief and dismissed the complaint. The present appeal is from his order.

---

* Concurrence in this decision was received from Judge Burger prior to May 21, 1969 —the date on which his nomination for Chief Justice of the United States was announced.

1. § 193g. [*United States Capitol Grounds;*] *parades or assemblages; display of flags*
It is forbidden to parade, stand, or move in processions or assemblages in said United States Capitol Grounds, or to display therein any flag, banner, or device designed or adapted to bring into public notice any party, organization, or movement, except as hereinafter provided in sections 193j and 193k of this title.
40 U.S.C. § 193g (9 D.C.Code § 124). The Capitol Grounds are described as follows:
The United States Capitol Grounds shall comprise all squares, reserva-tions, streets, roadways, walks, and other areas as defined on a map entitled "Map showing areas comprising United States Capitol Grounds", dated June 25, 1946, approved by the Architect of the Capitol and recorded in the Office of the Surveyor of the District of Columbia in book 127, page 8, including all additions added thereto by law subsequent to June 25, 1946, * * *.
40 U.S.C. § 193a (9 D.C.Code § 118). From the map referred to in the section, the main area of the Capitol Grounds is bounded on the north by Union Station, extends some three blocks south of the Capitol to include the fountains beyond the House Office Building, a similar three blocks west to the base of Capitol Hill and three blocks east to the rear of the Library of Congress annex.

Appellants were permitted to march to the rear of the Capitol at the foot of the hill there. Miss Rankin, their leader, and a 15-woman delegation, presented their petitions to the Speaker of the House and to the Majority Leader of the Senate.[2]

After the demonstration and presentations were made as permitted the Brigade disbanded, with announcement of the intention of the ladies to return to their communities "to mobilize women on all levels to exercise their political power to reshape American society."

At oral argument on appeal counsel for appellants abandoned their request for present injunctive relief, represented to the court that no particular parade was planned, and urged this court to declare Section 193g unconstitutional on its face. Due to the position thus stated, counsel contends a three-judge District Court need not be convened. She stated her position to be, however, that the allegation of the complaint that appellants intend to return for demonstration purposes individually and as an organization is to be taken as true, and that should it be necessary an injunction based on this court's declaration would then be sought. Appellees contend that since the Brigade has dispersed and neither it nor any individual appellant has any present intention of taking any step the statute would inhibit, the case has become moot. They also urge that if the case is not moot then dismissal of the complaint by the single District Judge should be affirmed since the constitutional question is insubstantial, and therefore, the motion for a three-judge court was properly denied.

We hold (1) that the case is not to be dismissed by this court as moot; (2) that the constitutional question is not insubstantial; and (3) that a three-judge District Court should have been convened and should now be convened to dispose of the several facets of the case hereinafter outlined, as they might appear at the hearing on the remand.

■ 1. Firstly as to mootness. While the events of January 15, 1968, when the Brigade assembled here, have long since ended appellants have been denied, by reason of the challenged statute, rights of assembly and petition in a manner they claim the Constitution protected. The statute as enforced continues to be a bar to assertion of those rights, which the complaint alleges will be reasserted, and at argument counsel for appellants stated that injunctive relief would then be sought again if necessary. Should appellants seek to resume exercise of the claimed rights the availability of timely judicial action to avoid interference cannot be predicted. The rights asserted, imbedded in the Constitution, are of a continuing character, and the Vietnam problem remains. As in Southern Pacific Terminal Co. v. I.C.C., 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310, the questions involved are continuing and "their consideration ought not to be, as they might be, defeated, by short term orders, capable of repetition, yet evading review * * *." The rights of peaceable assembly and petition at the seat of government have more than ordinary significance. The history of enforcement of the challenged statute, with sound reason to view

2. Appellants had also been advised by appellee Chief of Capitol Police that, if they came on to the Capitol grounds in groups of ten to fifteen persons and remained in such small groups all of them would be allowed on the grounds just as any other group of persons would be. [They would be] free to visit the members of Congress, present whatever petitions they desired and could go anywhere else on the Capitol grounds that other members of the public could go upon.

Further,
that the only prohibition was that they not march and assemble as one large group on the Capitol grounds.
They were also informed that although Louisiana Avenue was within the Capitol Grounds they could, pursuant to 40 U.S. C. § 193k (9 D.C.Code § 129), use it for their mass gathering, or that a permit to use Union Square could be obtained from the National Park Service.

the controversy initiated by appellants to be of a continuous character, persuades us on the present record that the justiciable character it originally assumed has not dissolved. Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1; Carroll v. President and Commissioners of Princess Anne County, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325. On the remand, however, which we shall order for reasons later to be stated, we do not foreclose the issue of mootness from consideration by the District Court as the situation may then appear.

■■■ 2. Since we do not dispose of the case as moot we have the question whether it is within the jurisdiction of a three-judge court convened under 28 U.S.C. § 2284. Insofar as this depends upon the substantiality of the constitutional question we think the case was one for a three-judge court. The broad sweep of Section 193g, and the absence of more definite legislative guidelines to govern its application, raise not insubstantial questions whether the First Amendment rights asserted were invalidly infringed by the invocation against appellants of that section of the statute. Carroll v. President and Commissioners of Princess Anne County, *supra;* Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697; Cox v. Louisiana, 379 U.S. 536, 559, 85 S.Ct. 453, 476, 13 L.Ed.2d 471, 481; Adderley v. Florida, 385 U.S. 39, 87 S. Ct. 242, 17 L.Ed.2d 149. Dismissal of the complaint by a single District Judge accordingly was inconsistent with 28 U.S.C. § 2282. The operation of an Act of Congress as repugnant to the Constitution was sought to be enjoined and the constitutional challenge was not insubstantial.[3]

■ 3. The question remains, however, whether counsel's position stated at argument of the appeal, that only a declaratory judgment at the hands of this court was sought, removed the case from the embrace of Section 2282, notwithstanding the constitutional challenge continues. This requires consideration of Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644. The case was an action by Mendoza-Martinez (1) for a declaratory judgment firstly that he was a citizen, secondly that Section 401(j) of the Nationality Act of 1940, 58 Stat. 746 (1944), under which the Government claimed his citizenship had been lost, was unconstitutional, and (2) for voiding of all orders of deportation directed against plaintiff. Section 401(j) provided that one who remained outside the United States to avoid military service thereby lost his American citizenship. Plaintiff had been found to be factually within this provision. For this reason the Government had ordered him deported as an alien. A single District Judge, however, held Section 401(j) unconstitutional. When the case reached the Supreme Court it was considered as a threshold question whether the proceedings should have been heard by a three-judge court convened pursuant to 28 U.S.C. § 2282. The Court answered in the negative. It pointed out that the original complaint asked for no injunctive relief, and none was granted. An amended complaint, which raised an issue of collateral estoppel, did include a prayer that the court enjoin and restrain defendants from enforcing deportation orders against plaintiff; but the Court thought it clear from the stipulation which governed the course of the trial that the issues were framed so as not to contemplate any injunctive

3. That the statute, though geographically applicable only to the District of Columbia, is an "Act of Congress" within the meaning of 28 U.S.C. § 2282 seems now to be settled. Shapiro v. Thompson and companion cases, 394 U.S. 618, 625 n. 4, 89 S.Ct. 1322, 1326, 22 L.Ed.2d 600. True it is, the statute affects only a part of the District of Columbia, the Capitol Grounds, but this limited geographical scope is outweighed, in considering the embrace of Section 2282, by the importance to be attached to an Act of Congress enacted to protect the national legislature at the very seat of its operations.

relief. The relief granted was a declaration that the challenged section was unconstitutional on its face and as applied to the plaintiff, and that he was a national and citizen of the United States. The Court stated:

> Thus, despite the amendment to Mendoza-Martinez' complaint before the third trial, it is clear that neither the parties nor the judge at any relevant time regarded the action as one in which injunctive relief was material to the disposition of the case. Since no injunction restraining the enforcement of § 401(j) was at issue, § 2282 was not in terms applicable to require the convening of a three-judge District Court.

> Whether an action solely for declaratory relief would under all circumstances be inappropriate for consideration by a three-judge court we need not now decide, for it is clear that in the present case the congressional policy underlying the statute was not frustrated by trial before a single judge.

372 U.S. at 154, 83 S.Ct. at 560.

Our case seems to us to be quite different. Not only was injunctive relief sought, but plaintiffs properly moved for a three-judge court. The case fell within the jurisdiction of such a court. Injunctive relief "was material to the disposition of the case" as it was presented to the District Court. Moreover, should a declaratory judgment now be issued that Section 193g is unconstitutional it would have a restraining effect comparable to injunctive relief; for appellees might well deem themselves restrained in the day to day operation and enforcement of the statute. The fact is the court itself might well deem an injunctive order appropriate to accompany its declaration, as originally sought. In contrast, the *Mendoza-Martinez* decision, "which in form was for declaratory relief and which in its agreed substance did not contemplate injunctive relief," was a declaration of the plaintiff's status as a citizen, though as a necessary incident to such declaration the statute invoked by the Government was held to be unconstitutional, as, for example, in Flemming v. Nestor, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435, and comparable cases. There is the solid distinction between our case and *Mendoza-Martinez, Nestor* and comparable cases,[4] that this case clearly should have been disposed of under Section 2282. The allegations of the complaint which gave it that character remain, and even the representations of counsel in argument on appeal, upon which reliance is placed to remove it from those sections, include the representation that injunctive relief is contemplated to make effective the declaration of unconstitutionality when appellants or some of them reassert the rights they claim, which leads us now to hold that the case is not moot. It accordingly seems to us that this litigation, which began as a three-judge court case, has not lost its character as an effort to place out of operation as repugnant to the Constitution an Act of Congress protective of the national legislature in the environs of its national home. We accordingly shall remand the case for disposition by a court to be convened under Section 2284. No time element thus involved affects the question of jurisdiction. Moreover, no present urgency appears.

■■ Other matters we think need mention. The authority of a federal court to issue a declaratory judgment is discretionary. In addition, such a judgment will not be rendered unless the case has the "immediacy" and "reality" essential to the exercise of this particular authority.

As to the court's discretion, *see* Alabama State Federation of Labor v. McAdory, 325 U.S. 450, 461, 65 S.Ct. 1384,

---

4. *See, e. g.*, Petersen v. Clark, 285 F.Supp. 698 (N.D.Cal.); United States v. Southern Railway Co., 250 F.Supp. 759, 766–770 (D.S.Car.), rev'd, 380 F.2d 49, 55 (4th Cir.). *See also* Currie, The Three-Judge District Court in Constitutional Litigation, 32 U.Chi.L.Rev. 1, 13–20, 76–79.

89 L.Ed. 1725,[5] cited approvingly in Thorpe v. Housing Authority of City of Durham, 393 U.S. 268, 284 n. 47, 89 S.Ct. 518, 21 L.Ed.2d 474, where Zemel v. Rusk, 381 U.S. 1, 18–20, 85 S.Ct. 1271, 14 L.Ed.2d 179, is also cited. In Zemel v. Rusk, it is said *inter alia:*

> * * * the Declaratory Judgment Act, 28 U.S.C. § 2201 (1958 ed.), "is an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." Public Serv. Comm'n of Utah v. Wycoff Co., 344 U.S. 237, 241, 73 S.Ct. 236, 239, 97 L.Ed. 291.

*See, also,* United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L. Ed. 754.

As to whether, aside from the question of discretion, the case retains such "immediacy" or "reality" as justifies the rendering of a constitutional decision, *see* Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113. At an earlier stage of the *Zwickler* litigation, Zwickler v. Koota, 389 U.S. 241, 244 n. 3, 88 S.Ct. 391, 19 L.Ed.2d 444, and *see id.* at 255, 88 S.Ct. 391, the Court had remanded the case to the District Court for further proceedings which would include consideration by that court of whether "the prerequisites to a declaratory judgment" had been adjudicated. On the remand the District Court had decided this as the facts appeared at the time the complaint was filed. When the case returned to the Supreme Court, however, as Golden v. Zwickler, *supra,* the Court held this was erroneous:

> The proper inquiry was whether a "controversy" requisite to relief under the Declaratory Judgment Act existed at the time of the hearing on the remand.

394 U.S. at 108, 89 S.Ct. at 959. Saying "we now undertake that inquiry," the Court pointed out as follows the prerequisites for constitutional adjudication, including such adjudication by declaratory judgments:

> "[T]he federal courts established pursuant to Article III of the Constitution do not render advisory opinions. For adjudication of constitutional issues, 'concrete legal issues, presented in actual cases, not abstractions,' are requisite. This is as true of declaratory judgments as any other field." United Public Workers of America v. Mitchell, 330 U.S. 75, 89, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947). "The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

394 U.S. 103, 108, 89 S.Ct. at 959. Further, said the Court:

> It was not enough to say, as did the District Court, that nevertheless Zwickler has a "further and far broad-

5. Chief Justice Stone's opinion for the Court in Federation of Labor v. McAdory, 325 U.S. 450, 461, 65 S.Ct. 1384, 1389, points out that "It has long been [the Court's] considered practice not to decide * * * any constitutional question in advance of the necessity for its decision," citing, Charles River Bridge v. Proprietors of Warren Bridge, 11 Pet. 420, 553, 9 L.Ed. 773; Trade-Mark Cases, 100 U.S. 82, 96, 25 L.Ed. 550; Liverpool, N. Y. & P. S. S. Co. v. Emigration Comm'rs, 113 U.S. 33, 39, 5 S.Ct. 352, 28 L.Ed. 899; Burton v. United States, 196 U.S. 283, 295, 25 S.Ct. 243, 49 L.Ed. 482; Arkansas Fuel Oil Co. v. Louisiana, 304 U.S. 197, 202, 58 S.Ct. 832, 82 L.Ed. 1287. And see Chief Justice Warren's statement of this principle in Thorpe v. Housing Authority, *infra.*

er right to a general adjudication of unconstitutionality \* \* \* [in] [h]is own interest as well as that of others who would with like anonymity practice free speech in a political environment \* \* \*." The constitutional question, First Amendment or otherwise, must be presented in the context of a specific live grievance. In United Public Workers of America v. Mitchell, *supra*, at 89–90, 67 S.Ct. at 564, we said:

> "The power of courts, and ultimately of this Court, to pass upon the constitutionality of acts of Congress arises only when the interests of litigants require the use of this judicial authority for their protection against actual interference. A hypothetical threat is not enough."

394 U.S. 103, 109–110, 89 S.Ct. at 960.

While the Supreme Court itself concluded the prerequisites for issuance of a declaratory judgment had not been established on the remand, it did so on the record made in the District Court on the remand. The posture of our case differs. We have no such record; and the issue of immediacy and reality—of aliveness of the appellants' grievances—should be determined initially by the District Court on the record at the time of the hearing on the remand, subject to such review as might be appropriate.

Since the case in our view is not moot and falls within the jurisdiction of a three-judge court we shall remand it for the convening of such a court, the questions of mootness and what adjudication and relief should be granted to be determined by that court on the basis of the situation which is shown to exist at the time of the hearing on the remand.[6]

It is so ordered.

BAZELON, Chief Judge (dissenting):

The Jeannette Rankin Brigade and 58 individual women filed a complaint on January 8, 1968, seeking declaratory and injunctive relief against the enforcement of 40 U.S.C. § 193g (1964), which declares it illegal "to parade, stand, or move in processions or assemblages in \* \* \* [the] United States Capitol Grounds \* \* \*."[1] The complaint was accompanied by a motion requesting a three-judge court under 28 U.S.C. §§ 2282, 2284 (1964) to pass upon their claims. The District Court denied the motion and dismissed the complaint the next day on the ground that the constitutional issues raised were insubstantial, and therefore did not entitle the plaintiffs to a three-judge court.

The Government argues that because the Brigade has marched—although not on the Capitol Grounds—and since disbanded, this appeal is moot. The majority does not agree, nor do I. Although the plaintiffs have abandoned their demand for injunctive relief on this appeal, the majority concludes that a three-judge court is nevertheless required in the present posture of the case. On this point I reach a contrary conclusion. On the merits, which the majority does not reach, I would find that the sweep of Section 193g so far exceeds whatever limitations the public interest might justify upon the right to petition Congress that we must declare this law unconstitutional on its face.

6. While the problems of discretion and of the prerequisites for issuance of a declaratory judgment are separate, they are not unrelated, the latter bearing upon the former. Moreover, the facts with respect to mootness may well be relevant to the *Zwickler* standards for declaratory judgment adjudication.

1. Section 193g (1964) provides:
   It is forbidden to parade, stand, or move in processions or assemblages in said United States Capitol Grounds, or to display therein any flag, banner, or device designed or adapted to bring into public notice any party, organization, or movement, except as hereinafter provided in sections 193j and 193k of this title.

   The statutory scheme of which section 193g is a part is codified as both 40 U.S. C. § 193a *et seq.* (1964) and 9 D.C.Code § 118 *et seq.* (1967). All references in this opinion will for convenience be to the United States Code codification.

## I

The Jeannette Rankin Brigade was an ad hoc coalition of women from all parts of the nation opposed to this country's involvement in Vietnam and inattention to domestic problems. To impress their concern upon the 90th Congress, the members planned to march from Union Station to the Capitol on January 15, 1968, the opening day of the second session. The Chief of the Capitol Police, however, informed them on January 2 that Section 193g prohibited such a parade. Although the act forbids all "processions or assemblages,"[2] the police chief added his own gloss: "I explained to the ladies that if they came to the Capitol grounds in groups of ten to fifteen persons and remained in such small groups all of them would be allowed on the grounds just as any other group of persons would be."

That concession was unacceptable to the plaintiffs, and this lawsuit followed on January 8. The plaintiffs appealed immediately after the District Court's dismissal the next day. But since no appellate relief was available before January 15, the march proceeded not to the Capitol but to the base of the hill behind the Capitol, where the 5,000 women in ranks could not see Miss Rankin and her 15-woman delegation present their petition to the Speaker of the House and the Senate Majority Leader. The Brigade then disbanded with the announced intention "to return to our communities and mobilize women on all levels to exercise their political power to reshape American society."

The Government argues that the controversy disappeared with the Brigade and the case is moot. Since the Brigade and its members claim that they wish to return to Washington for future protests, however, the issue is broader. To determine whether the plaintiffs may pursue this appeal we must both decide whether there is a "case or controversy" within the meaning of Article III of the Constitution and exercise our discretionary power under the Declaratory Judgment Act[3] to appraise the propriety of this suit. Because possible future conflicts may sometimes create a case or controversy, the plaintiffs may deserve the decision they demand even if time has mooted the January 1968 chapter of their dispute. And, conversely, our reluctance to adjudicate constitutional issues upon an imperfect record may demand affirmance of the dismissal below even if the case is not moot in a formal sense.

The plaintiffs held a protest march last year and claim that they may wish to petition Congress again sometime. The possibility must be examined, however, that they may now rest in a trough between protests, having lost the momentum for litigation provided by the past march and not yet acquired the propelling force of concrete plans for another. As far as future conduct is concerned, United Public Workers v. Mitchell[4] illustrates the distance between a case or controversy and a "hypothetical threat" that constitutional rights may be infringed if the plaintiffs decide to violate an allegedly unconstitutional statute and if the Government then decides to enforce it.[5] Twelve federal employees attempted there to attack a portion of the Hatch Act.[6] One plaintiff had already been charged with violating the Act; the Court concluded that he met "the requirements of defined rights and a definite threat to interfere with a

2. With certain exceptions not applicable here. See 40 U.S.C. §§ 193j, 193k (1964).

3. 28 U.S.C. § 2201 (1964).

4. 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947).

5. Professors Hart and Wechsler have, without advancing an answer, examined the propriety of declaratory relief in this sort of situation, which they describe as "doubly contingent." *See* H. M. Hart, Jr. & H. Wechsler, The Federal Courts and the Federal System 139–40 (1953).

6. Act of August 2, 1939, ch. 410 § 9(a), 53 Stat. 1148, *as amended*, 5 U.S.C. § 7324(a) (Supp. III, 1968).

possessor of the menaced rights," [7] and proceeded to find the challenged provision valid. The remaining eleven plaintiffs alleged that they wished to engage in prohibited political activities but were deterred by the threat of losing their jobs. As to them, the majority found that "it would not accord with Judicial responsibility" to adjudicate their claims since "we can only speculate as to the kinds of political activity the appellants desire to engage in or as to the contents of their proposed public statements or the circumstances of their publication." [8]

The possibility that past conduct, like unspecified future conduct, may not open judicial doors is shown by Golden v. Zwickler.[9] The individual plaintiff there had been convicted for distributing anonymous handbills during a political campaign. Although the appellate court in New York reversed his conviction on nonconstitutional grounds, Zwickler instituted a suit for a declaratory judgment that the statute was invalid. The Supreme Court reversed a decision by the district court dismissing the suit on abstention grounds,[10] pointing out in footnotes that the trial court on remand should consider "whether appellant's allegations entitle him to a declaratory judgment" [11] and whether "this matter now might be properly dismissed for mootness." [12]

The trial court, relying upon Evers v. Dwyer,[13] concluded that the controversy was not moot although the political campaign was long past and the political candidate Zwickler opposed was unlikely to run again for elective office:

> We see no reason to question Zwickler's assertion that the challenged statute currently impinges upon his freedom of speech by deterring him from again distributing anonymous handbills. His own interest as well as that of others who would with like anonymity practise free speech in a political environment persuade us to the justice of his plea.[14]

The Supreme Court abruptly reversed the district court in a unanimous opinion. Mr. Justice Brennan first pointed out that the lower court erred "in holding that Zwickler was entitled to declaratory relief if the elements essential to that relief existed '[w]hen this action was initiated.'" The proper inquiry was "whether a 'controversy' * * * existed at the time of the hearing on remand." [15]

Embarking upon that inquiry, the Court rejected the district court's conclusion that the plaintiff could assert the interest "of others who would with like anonymity practice free speech." Since "the constitutional question * * * must be presented in the context of a specific live grievance," Justice Brennan limited his gaze to Zwickler and his handbills.[16] Having thus focused the issue, the Court assigned controlling weight to "the fact that it was most unlikely that the Congressman would again be a candidate for Congress" [17] in deciding Zwickler did not meet the requirements for a declaratory judgment.

The disappearance of Congressman Multer from the political scene was decisive, however, only because the Justices read his complaint and the record to indicate that "Zwickler's sole concern was literature relating to the congressman

---

7. 330 U.S. at 92, 67 S.Ct. at 566.

8. *Id.* at 90, 67 S.Ct. at 564.

9. 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (U.S., March 4, 1969).

10. Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).

11. *Id.* at 244 n. 3, 88 S.Ct. at 393.

12. *Id.* at 252 n. 16, 88 S.Ct. at 398.

13. 358 U.S. 202, 79 S.Ct. 178, 3 L.Ed.2d 222 (1958).

14. Zwickler v. Koota, 290 F.Supp. 244, 249 (E.D.N.Y.1968).

15. 89 S.Ct. at 959.

16. *Id.* at 89 S.Ct. at 960.

17. *Id.* at 89 S.Ct. at 960.

and his record."[18] A different interpretation might have been possible, since the complaint alleged that the plaintiff also wished to distribute "similar anonymous handbills * * * in subsequent election campaigns or in connection with any election of party officials."[19] The Court was undoubtedly correct, however, that the "complaint focus[ed] upon the then forthcoming 1966 election when, it was alleged, the congressman would again stand for re-election."[20] But the opinion does not reveal whether the Court applied a "focus" test under which a tacked-on clause referring to other "party officials" should be ignored, or whether the Court interpreted that clause to refer to an election of "party officials" in which Congressman Multer was a candidate. The decision suggests the latter by its cryptic observation that Zwickler's assertion that he "might distribute anonymous handbills relating to 'party officials'" did not affect its conclusion since "the Congressman held an elective party position as a district leader."[21]

The distinction is important to this case, because while the plaintiffs' lawsuit initially sought injunctive relief for the January 1968 protest march, they alleged in a separate paragraph of their complaint that "plaintiffs * * * not only intend to petition Congress on this occasion * * * but intend thereafter to continue to do so in accordance with · their First Amendment rights." Unquestionably, their complaint "focused" upon the 1968 march, and by such a test their appeal would be moot. Just as unquestionably, however, they alleged an intention to renew their protests regarding the war in the future.

There is superficial merit in a test which prevents plaintiffs from drawing a beadsight upon one target occasion—with its own concrete facts—but retaining the option to rely upon unspecified

future events through the device of a catchall *ad damnum* clause in their complaint. But, as other Supreme Court cases illustrate, future events that are contingent but likely to materialize sometimes are sufficiently related to the specific occasion which prompted a lawsuit to represent foreseeable developments in a continuing controversy which justifies appellate adjudication of a case even in the trough between the initial occasion, now past, and future occasions yet to arise. In these circumstances, the future events cannot be detailed in a complaint unless plaintiffs are expected to plan their campaign unto the farthest generation—and, because plaintiffs sometimes cannot themselves usher in the expectable future occasions, sometimes not even then. Since this is so, a test which measures a case or controversy by looking only to the focus of a complaint might geld the continuing controversy doctrine of all vitality. Since we think it improbable that Golden v. Zwickler contemplated any such abandonment of precedent, especially in view of the care taken to fit the phrase "other officials" to the reading that the plaintiff sought only to attack his personal *bete noire,* I conclude that the clear allegation of contemplated future protests in this complaint removes this case from the rationale in *Zwickler.*

The mere assertion that this is a continuing controversy, of course, no more makes it one than, as Abraham Lincoln observed calling a sheep's tail a leg gives that wooly animal five legs. To decide whether the possibility of future protests entitle the plaintiffs to declaratory relief, this lawsuit must be laid against the Supreme Court decisions that shape the continuing-controversy doctrine. The Government relies chiefly upon Local No. 8–6, Oil, Chemical and Atomic Workers International Union v. Missouri[22] to argue that the controversy ended with the 1968 protest march. In the *Oil Work-*

---

18.  *Id.* at 89 S.Ct. at 960.

19.  *See id.* at 89 S.Ct. at 959.

20.  *Id.* at 89 S.Ct. at 960.

21.  *Id.* at n. 5, 89 S.Ct. at 960.

22.  361 U.S. 363, 80 S.Ct. 391, 4 L.Ed.2d 373 (1960).

*ers* case, the union attacked a state law under which the governor had seized a utility company and obtained an injunction against a strike then in progress. By the time the case reached the Supreme Court, the strike and seizure had ended, and the underlying labor dispute had been settled by a new collective bargaining agreement. The Court found the case moot, concluding that the "threat of state seizure in future labor disputes" did not justify review of the statute's constitutionality.[23]

When another case brought the same statute before the Court three years later, however, the Justices concluded in Division 1287 of Amalgamated Assn. of Street etc. Employees v. Missouri [24] that a suit was not moot where the labor dispute remained unsettled, although the strike and seizure had ended.

Whether a dispute or controversy still continues is often less clear outside the labor field. In Carroll v. President and Comm'rs of Princess Anne County,[25] for example, a white supremacist organization sought review of an ex parte injunction issued against a rally. Although the occasion had long since passed, and the 10-day injunction had expired, the Supreme Court concluded that the suit deserved adjudication on the merits because "it appears that the decision of the [state court upholding the injunction] * * * continues to play a substantial role in the response of officials to * * [the organization's] activities." [26]

*Carroll* represents a broad reading of the continuing dispute concept, and by the test there applied a controversy continues to exist in this case. Citizens still wish to petition Congress concerning the war in Vietnam, and Section 193g "con-

tinues to play a substantial role in the response of officials to their activities." Of course, a critical fact in both *Bus Employees* and *Carroll* was that the organizations that began the lawsuits were still active. Here, the Brigade apparently has ceased to exist, at least under that name. But there were also 58 individual plaintiffs who alleged their intention to petition Congress on future occasions. The individual appellants therefore assert a continuing interest in the ongoing controversy. The Government argues that their proper road to relief is initiation of another lawsuit sufficiently in advance of some future parade or protest to permit a decision—including, presumably, one by an appellate court —before the event. Perhaps protestors should plan far ahead, and litigate their rights before attempting to exercise them. But such is not the reality of protest. Spontaneity is often the hallmark of political opposition. Protest groups commonly struggle with mixed success to organize their efforts at the final moment. Realistically, the interval between the planning and the execution of a protest will be too short for a lawsuit to reach an appellate court.

In the *Carroll* case, the Supreme Court concluded that " 'consideration [of the issues raised] ought not to be, as they might be, defeated by short term orders, capable of repetition, yet evading review * * *.' " [27] There was, of course, no short-term order in this case. But there was a definite threat of prosecution directed against, and actually affecting, a planned march. The facts of this case well illustrate the invalidity of the "assumption that defense of a criminal prosecution will generally assure ample vindication of constitutional rights," [28] since

23. *Id.* at 368–369, 80 S.Ct. at 395.

24. 374 U.S. 74, 83 S.Ct. 1657, 10 L.Ed.2d 763 (1963).

25. 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968).

26. *Id.* at 178, 89 S.Ct. at 350.

27. *Id.* at 179, 89 S.Ct. at 350, quoting from Southern Pac. Term. Co. v. ICC, 219

U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911) ; *see also* Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969) ; cf. Friend v. United States, 128 U.S.App.D.C. 323, 388 F2d 579 (1967).

28. Dombrowski v. Pfister, 380 U.S. 479, 486, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965).

as here, "'[t]he threat of sanctions may deter * * * almost as potently as the actual application of sanctions. * *'" [29]

Although the probability of future incidents in the continuing controversy over the right to protest on the Capitol Grounds places this case within the sweep of Article III, it does not automatically follow that the plaintiffs are entitled to declaratory relief. For as the Supreme Court pointed out in Zemel v. Rusk, "the Declaratory Judgment Act * * * 'is an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant.'" [30] The plaintiff in *Zemel* sought a declaration whether he could be criminally prosecuted for travel to Cuba. The Supreme Court declined to adjudicate his claims because "the complaint filed in this case does not specify the sort of travel to Cuba appellant has in mind." [31] The opinion went on to discuss the myriad permutations of fact and accompanying intent by which the appellant might exit from or re-enter this country on a direct or indirect trip to or from Cuba. "To avoid rendering a series of advisory opinions," the Court refused to consider "whether each or any of these gradations of fact or charge would make a difference as to criminal liability." [32]

To decide whether declaratory relief is appropriate in this case, the court must therefore consider whether subtle shifts in possible factual matrices would affect our appraisal of Section 193g. Since "attacks on overly broad statutes" do not require that "the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow speci-

ficity," [33] it might seem that the facts of a particular case would be immaterial to our determination whether Section 193g is constitutional on its face. Such reasoning, however, presupposes that we know the face of Section 193g with precision. Since no appellate court has authoritatively construed this statute, that precondition may not be met. Any constitutional adjudication by this court would accordingly need to proceed in tandem with the task of deciding exactly what conduct it proscribes. An important pillar for the requirement of a concrete case or controversy is the consideration that a well-developed factual record is often an essential aid in statutory interpretation.

Two factors persude me that this potential problem need not preclude declaratory relief, however. The first arises from the nature of the statute involved; the second, from the record in this case. Section 193g is clear in forbidding all parades or assemblages on the Capitol Grounds, with no reference to criminal intent or attendant circumstances. [34] Upon occasion, of course, an appellate court may settle upon a narrow construction to uphold the constitutionality of a statute. But there are limits to this process. [35] Where Congress has been elliptic in mapping its intention onto the statute books, courts may supply an element of an offense which the legislature presumptively wished to require but neglected to state. [36] There is no indication, however, that surgery would be appropriate to conform Section 193g to any presumed intention of Congress. As I discuss elsewhere in this opinion, the legislature pointedly declined to modify or repeal

29. *Id.*, quoting from NAACP v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed. 2d 405 (1963).

30. 381 U.S. 1, 19, 85 S.Ct. 1271, 1282, 14 L.Ed.2d 179 (1965).

31. *Id.*

32. *Id.* at 19–20, 85 S.Ct. at 1282; cf. Travis v. United States, 385 U.S. 491, 87 S.Ct. 583, 17 L.Ed.2d 536 (1967); United States v. Laub, 385 U.S. 475, 87 S.Ct. 574, 17 L.Ed.2d 526 (1967).

33. Dombrowski v. Pfister, 380 U.S. 479, 486, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965).

34. *See supra* note 1.

35. *See, e. g.,* Aptheker v. Secretary of State, 378 U.S. 500, 506, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964).

36. *See, e. g.,* Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1951).

this section when revising the statutory framework dealing with the Capitol Grounds in 1967.[37] Since other statutory provisions now encompass conduct threatening definite governmental interests or accompanied by an intent to do so,[38] I must conclude that Congress preserved Section 193g under a belief that its blanket prohibition extended to situations beyond the reach of these provisions. Consequently, a narrower construction finds no support in this recent manifestation of legislative will. Nor is such an interpretation necessary, as sometimes is the case in constitutional adjudication, to prevent the creation of a statutory vacuum in an area where appropriately narrow regulations may be necessary to protect legitimate state interests.

The second factor affecting the exercise of our discretionary power to grant or withhold declaratory relief is the evidence in the record before us of an actual protest march. The plaintiffs made detailed plans, which were modified in response to a threat of prosecution, and the women of the Brigade did march to the base of Capitol Hill. While, as *Zwickler* points out, the existence of a concrete controversy at the inception of a lawsuit cannot justify after-the-fact relief, the 1968 march—in addition to lending credibility to the allegations of planned contemplated future protests and fears of prosecution then—provides a factual foundation for a declaratory judgment to settle the continuing controversy over Section 193g.

In short, I cannot dismiss as speculative the possibility that some of the individual appellants will wish to parade or protest again. Nor have I reason to doubt that the Capitol Police will again threaten prosecution—or, for that matter, that prosecution will actually be initiated if threats do not deter would-be petitioners. Although there apparently has never been a conviction under Section 193g, there have been other threats of prosecution,[39] and at least one successful prosecution.[40] Invocation of the statute is not so unlikely as to bar relief.[41] Nor does the posture of this case present an inadequate record upon which to base a declaratory judgment.

II

Having concluded that this case is not moot, I must next consider what issues are before this Court on appeal. The plaintiffs initially moved for a three-judge court under 28 U.S.C. §§ 2282, 2284 (1964) since their original complaint demanded both declaratory and injunctive relief. The trial judge, in dismissing their complaint and refusing to convene a three-judge court, found their constitutional challenges to Section 193g "plainly unsubstantial."

Had the case remained in this posture on appeal, the court's only task would be to determine whether the constitutional issues raised below were in fact obviously without merit.[42] Since 28 U.S.C. § 1253 (1964) provides for direct review by the Supreme Court in any action "required * * * to be heard and determined by a district court of three judges," intermediate review by this Court on the merits of the case would be inappropriate if the issues were substantial, and a three-judge court therefore required.[43]

---

37. *See infra* note 62.

38. *See infra* notes 92–94.

39. *See* Feeley v. District of Columbia, 128 U.S.App.D.C. 258, 261, 387 F.2d 216, 219 (1967).

40. *See* United States v. Buchard, No. 16,019–68 (D.C.Ct.Gen.Sess., Sept. 16, 1968).

41. *Cf.* Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961).

42. *See* Idlewild Bon Voyage Liquor Corp. v. Epstein, 370 U.S. 713, 82 S.Ct. 1294, 8 L.Ed.2d 794 (1962) ; Reed Enterprises v. Corcoran, 122 U.S.App.D.C. 387, 354 F.2d 519 (1965).

43. *See* Idlewild Bon Voyage Liquor Corp. v. Epstein, 370 U.S. 713, 715–716, 82 S.Ct. 1294 (1962) ; Stratton v. St. Louis S. W. Ry., 282 U.S. 10, 51 S.Ct. 8, 75 L.Ed. 135 (1930) ; Gong v. Kirk, 375 F.2d 728, 729 (5th Cir. 1967), aff'd 389

The height of the threshold a claim must surmount to be "substantial" is unclear. The Supreme Court has stated, in *Ex parte Poresky*,

> The question may be plainly insubstantial, either because it is 'obviously without merit' or because its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject * * *.[44]

The rapidity with which "previous decisions" are sometimes abandoned demonstrates that some sensitivity is required to apply the latter branch of this test.[45] The former branch, that of "obvious lack of merit," is similarly imprecise; as Judge Friendly has observed, "Judges have not been fitted with identical lenses for detecting just when lack of merit is 'obviously' such."[46]

There is, moreover, an undoubted artificiality to any effort to review the substantiality of constitutional issues without determining their ultimate merit.[47] That difficulty is magnified in cases such as this where a statute is attacked as unconstitutional on its face. For a three-judge appellate panel to examine the statute on its face in order to conclude that the issues are sufficiently substantial to require a three-judge district court to examine the statute on its face might seem to some a patent reduplication of judicial effort.

On this appeal, however, I do not believe we need to shy from the merits and limit our gaze to the substantiality of the plaintiffs' constitutional claims. Since the planned protest march which occasioned this lawsuit has passed, and the plaintiffs accordingly no longer face as imminent a threat of prosecution, they have abandoned their demand for injunctive relief against the enforcement of Section 193g, and ask instead merely for a declaratory judgment that the statute is unconstitutional on its face.

The words of 28 U.S.C. § 2282 (1964) require a three-judge district court when an "injunction restraining the enforcement, operation or execution of any Act of Congress" is to be granted. Consequently, its literal language does not require a three-judge court where only declaratory relief is requested. The Supreme Court has given qualified approval to this reasoning. In Kennedy v. Mendoza-Martinez,[48] the plaintiff had dropped his demand for injunctive relief before trial, which was held before a single judge. The Supreme Court concluded that a remand for retrial before a three-judge panel was unnecessary, and instead affirmed the declaratory judgment granted by the district court that the statute there involved was unconstitutional.[49]

At least one commentator has criticized this literal reading of the statute, arguing that the practical effect of a declaratory judgment, in terms of preventing enforcement of the statute, is likely to be

---

U.S. 574, 88 S.Ct. 695, 19 L.Ed.2d 784 (1968).

44. 290 U.S. 30, 32, 54 S.Ct. 3, 4, 78 L.Ed. 152 (1933).

45. *See, e. g.,* Reid v. Covert, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957), withdrawing Kinsella v. Krueger, 351 U.S. 470, 76 S.Ct. 886, 100 L.Ed. 1342 (1956); Reid v. Covert, 351 U.S. 487, 76 S.Ct. 880, 100 L.Ed. 1352 (1956); Barnette v. West Virginia State Bd. of Educ., 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), overruling Minersville School Dist. v. Gobitis, 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375 (1940).

46. Green v. Board of Elections, 380 F.2d 445, 448 (2d Cir. 1967).

47. *Cf.* Thornton v. Corcoran, 132 U.S.App. D.C. 232, 407 F.2d 695 (January 3, 1969).

48. 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963).

49. *Id.* at 152–155, 83 S.Ct. 554; *see also* Thompson v. Whittier, 365 U.S. 465, 81 S.Ct. 712, 5 L.Ed.2d 704 (1961); Flemming v. Nestor, 363 U.S. 603, 607, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960); Stratton v. St. Louis S. W. Ry., 282 U.S. 10, 15, 51 S.Ct. 8, 75 L.Ed. 135 (1930) (dictum); Allegheny Airlines, Inc. v. Fowler, 261 F.Supp. 508, 516 (S.D.N.Y. 1966).

**1104**

much the same as an injunction.[50] This argument has force, although pushed to its extreme the reasoning might require a three-judge district court whenever the constitutionality of any statute is challenged in any context—a result which would prevent any Court of Appeals from ever declaring a statute unconstitutional.

A legislative redrafting of the statutes providing for three-judge courts might well heed the functional similarity between declaratory judgments and injunctions restraining the enforcement of legislation. A court faced with the necessity to apply the present statutes, drafted long ago, should perhaps hew closely to their words to prevent an undue expansion of the three-judge court requirement, however.

The legislative history of 28 U.S.C. § 2282 (1964) and its complement dealing with injunctions against state legislation. 28 U.S.C. § 2281 (1964),[51] shows that Congress was primarily concerned with the possibility that a single federal judge might "paralyze totally the operation of an entire regulatory scheme * * * by issuance of a broad injunctive order."[52] The statutory provisions requiring three-judge courts should certainly be construed to remedy this mischief. But since these statutes, together with the direct review provisions of 28 U.

S.C. § 1253 (1964),[53] disrupt the normal functioning of the lower federal courts and enlarge the obligatory jurisdiction of the Supreme Court, there seems no need to expand the language of the statutory provisions to include cases which do not present the danger feared by the legislature.

The Supreme Court has consistently taken a "constrictive view" of the three-judge court requirement.[54] In doing so in Kennedy v. Mendoza-Martinez, it did not needlessly extend its analysis to decide "whether an action solely for declaratory relief would under all circumstances be inappropriate for consideration by the three-judge court."[55] The majority opinion instead concluded that a three-judge court was unnecessary in the case then before it, since "the present action * * * involve[d] none of the dangers to which the Congress was addressing itself":

The relief sought * * * affected an Act of Congress in a totally non-coercive fashion. There was no interdiction of the operation at large of the statute. It was declared unconstitutional, but without even an injunctive sanction against the application of the statute by the Government to Mendoza-Martinez. * * * Thus there was no reason whatever in this case to invoke

---

50. *See* Currie, The Three-Judge District Court in Constitutional Litigation, 32 U.Chi.L.Rev. 1, 14–19 (1964).

51. 28 U.S.C. § 2281 (1964) provides:
   An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title.

52. Kennedy v. Mendoza-Martinez, 372 U.S. 144, 154, 83 S.Ct. 554, 560, 9 L.Ed.2d 644 (1963) ; *see also* Currie, *supra* note 50, at 3–12.

53. 28 U.S.C. § 1253 (1964) provides:
   *Except as otherwise provided by law,* any party may appeal to the Supreme Court from an order granting or denying, after notice and hearing, an interlocutory or permanent injunction in any civil action, suit or proceeding required by any Act of Congress to be heard and determined by a district court of three judges. June 25, 1948, c. 646, 62 Stat. 928.

54. *See, e. g.,* Swift & Co. v. Wickham, 382 U.S. 111, 128–129, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965).

55. 372 U.S. 144, 154, 83 S.Ct. 554, 560, (1963).

the special and extraordinary procedure of a three-judge court.[56]

I find this analysis applicable to this lawsuit, stripped as it now is of any demand for injunctive relief. There is no danger that a broad regulatory program will be halted. Section 193g applies only to the Capitol Grounds. Its scope is indeed so limited that it might well fall within the exception to the three-judge court requirement judicially constructed for statutes of merely local applicability.[57]

The majority reaches an opposite conclusion, finding that the suit, "which began as a three-judge court case, maintains that character. * * *" I see no reason why a lawsuit must, like a leopard, keep the spots with which it began life. Nor did the Supreme Court in *Mendoza-Martinez*. The fact that the request for an injunction was dropped on appeal here, rather than before trial as in *Mendoza-Martinez,* seems a distinction without a difference. Nor can I fathom the distinction the majority perceives between a declaration that the statute before us is unconstitutional and the Supreme Court's declaration that the statute before it in *Mendoza-Martinez* was unconstitutional. Indeed, the reasoning of the majority that declaratory relief in this case would "have a restraining or coercive effect roughly comparable to injunctive relief" is precisely the same observation others have made in commenting upon *Mendoza-Martinez*.[58] However cogent the argument, it hardly distinguishes the two cases.

I believe we should follow the approach of the Supreme Court and determine whether the policy underlying 28 U.S.C. § 2282 (1964) requires a three-judge court in a case such as this where the literal words of the statute do not. I find no policy-based reason to further delay adjudication of this case, and the majority suggests none. Consequently, I believe we should consider the plaintiffs' arguments on their merits. The proverbial wheels of justice have ground forward at a tortoise's pace in this case. I see no reason to send them spinning in reverse by a remand from this three-judge panel to a three-judge court for an adjudication, requiring no trial proceedings, of the facial validity of Section 193g.

### III

"The right of the people peaceably to assemble, and to petition the Government for a redress of grievances" is unquestionable: the First Amendment so provides, in precisely as many words. But similarly unquestionable is the right of the Government to regulate conduct in public areas and to protect the orderly processes of government.[59] Section 193g represents an attempted accommodation between these sometimes conflicting interests. The statute provides:

It is forbidden to parade, stand, or move in processions of assemblages in said United States Capitol Grounds or to display therein any flag, banner, or device designed or adapted to bring into public notice any party, organization, or movement, except as hereinafter provided in sections 193j and 193k of this title.

Sections 193j and 193k authorize the President of the Senate and the Speaker of the House of Representatives, or in their absence the Chief of the Capitol Police, to suspend the prohibitions of Section 193g "in order to admit of the due observance * * * of occasions of

---

56. *Id.* at 155, 83 S.Ct. 554 at 560.

57. *See, e. g.,* Moody v. Flowers, 387 U.S. 97, 101, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967).

58. *See* note 50, *supra.*

59. *See, e. g.,* Adderley v. Florida, 385 U.S. 39, 48–49, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) ; Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) ; Poulos v. New Hampshire, 345 U.S. 395, 405–408, 73 S.Ct. 760, 97 L.Ed. 1105 (1953) ; Cox v. New Hampshire, 312 U.S. 569, 574, 61 S.Ct. 762, 85 L.Ed. 1049 (1941) ; Cantwell v. Connecticut, 310 U.S. 296, 306–307, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

national interest becoming the cognizance and entertainment of Congress." [60]

The language of Section 193g first appeared in the statute books in 1882.[61] Since then there have been several recodifications, and various changes in and additions to the surrounding statutory provisions relating to conduct upon the Capitol Grounds. But the absolute prohibition against all "processions or assemblages" has remained untouched, despite suggestions to the legislature that passing years and progressive developments in the protection of First Amendment freedoms may have sorely dated the statute.[62]

Chief among these developments has been the advent and ongoing adumbration of the overbreadth doctrine. The insight that the State must tread cautiously and with careful precision when its actions threaten cherished personal freedoms is indeed so basic that no scholar or court could claim or be attributed authorship.[63] But whatever the antecedents of the overbreadth doctrine, it is now undisputed that any state action

in the area of First Amendment rights must be couched in the narrowest terms that will accomplish the pinpointed objective permitted by constitutional mandate and the essential needs of public order. In this sensitive field, the State may not employ "means that broadly stifle fundamen-

---

60. 40 U.S.C. § 193j (1964) provides:

In order to admit of the due observance within the United States Capitol Grounds of occasions of national interest becoming the cognizance and entertainment of Congress, the President of the Senate and the Speaker of the House of Representatives, acting concurrently, are authorized to suspend for such proper occasions so much of the prohibitions contained in sections 193b–193g of this title as would prevent the use of the roads and walks of the said grounds by processions or assemblages, and the use upon them of suitable decorations, music, addresses, and ceremonies; *Provided*, That responsible officers shall have been appointed, and arrangements determined which are adequate, in the judgment of said President of the Senate and Speaker of the House of Representatives, for the maintenance of suitable order and decorum in the proceedings, and for guarding the Capitol and its grounds from injury.

40 U.S.C. § 193k (1964) provides:

In the absence from Washington of either of the officers designated in section 193j of this title, the authority therein given to suspend certain prohibitions of sections 193b–193g of this title shall devolve upon the other, and in the absence from Washington of both it shall devolve upon the Capitol Police Board: *Provided*, That notwithstanding the provisions of sections 193g and 193j of this title, the Capitol Police Board is authorized to grant the Commissioners of the District of Columbia authority to permit the use of Louisiana Avenue for any of the purposes prohibited by section 193g of this title.

61. Act of July 1, 1882, 22 Stat. 126.

62. *See* Hearings on S. 2310 Before the Subcomm. on Bldgs. and Grounds of the Comm. on Public Works, 90th Cong., 1st Sess., at 9–10, 26 (1967).

63. The overbreadth analysis appears in several forms. State action can be overbroad in a horizontal sense if more individuals than necessary are affected by a restriction. Overbreadth of this sort may violate the Equal Protection clause. *See, e. g.*, Carrington v. Rash, 380 U.S. 89, 94–97, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965); *see also* Tussman & tenBroeck, The Equal Protection of the Laws, 37 Cal.L.Rev. 341, 347–53 (1949). If, on the other hand, state action affects individuals properly subject to restriction but interferes with their interests more severely than necessary, the overbreadth analysis functions in a vertical sense. This species of analysis can easily be traced back at least a generation, *see e. g.*, Bridges v. California, 314 U.S. 252, 260–261, 62 S.Ct. 190, 86 L.Ed. 192 (1941); Thornhill v. Alabama, 310 U.S. 88, 105–106, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). Some cases may be viewed in either fashion, in which case there may be some uncertainty whether state action violates the Equal Protection Clause or a more purely substantive right, such as the First Amendment. *See* Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed. 2d 24 (1968). For a novel application of the overbreadth analysis to bolster a finding that a statute constituted a bill of attainder, *see* United States v. Brown, 381 U.S. 437, 455–456 & n. 31, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965).

tal liberties when the end be more narrowly achieved." [64]

As this passage from Carroll v. President & Comm'rs of Princess Anne County suggests, the overbreadth analysis has found its most fertile soil in the area of First Amendment freedoms. Whether the right to speak and assemble is a preferred freedom or simply *primus inter pares* in the glossary of the Bill of Rights,[65] the Supreme Court has focused sharply upon its fundamental importance to a democratic body politic in setting stern limitations upon the breadth of governmental action in this sensitive sphere. The cases are fast becoming legion in which the Court has seized upon the overbreadth doctrine to protect First Amendment freedoms. Many of these cases have dealt with loyalty oaths [66] and sundry other restrictions upon access to public employment.[67] Other decisions have involved such diverse subject matter as passport denials [68] or threatened state prosecution for barratry [69] or alleged subversive activity.[70]

These cases have helped to clarify the contours of the overbreadth doctrine. But since the problem in each instance is to measure a particular governmental interest against the "breathing space" needed by the specific private interest at stake, Section 193g is best evaluated by an examination of those cases dealing with restrictions upon group protests on public property.

## IV

To structure a comparison between the prohibitions of Section 193g and those approved or disapproved by the Supreme Court in such cases as Edwards v. South Carolina,[71] Cox v. Louisiana,[72] and Adderley v. Florida,[73] it is useful to consider separately several factors. The first is the conduct prohibited: the specific activity outlawed, and where it is outlawed. Since state restrictions on First Amendment freedoms must be judged upon their face rather than as applied,[74] the primary focus must be the language of the restriction challenged rather than the actual conduct involved in each case. Of course, when the Supreme Court has adverted to specific conduct in analyzing the permissible scope of restrictions upon speech and assembly, that conduct acquires relevance.

A second important factor is the accompanying intent which must be proved. While mens rea may be a slippery, shifting concept in this as in all other areas, the proof of intent will frequently be conduct. And the sort of conduct that demonstrates the requisite intent may help to further delimit the activity forbidden, as well as the reason why it is forbidden.

On this latter score, the important factor is the governmental interest being protected. In some sense the maintenance of public order or unimpeded administration of government is always at

---

64. Carroll v. President & Comm'rs of Princess Anne County, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968).

65. *See, e. g.,* Dombrowski v. Pfister, 380 U.S. 479, 486, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). *Compare* Kovacs v. Cooper, 336 U.S. 77, 90–97, 69 S.Ct. 448, 93 L.Ed. 513 (1945) (concurring opinion of Frankfurter, J.).

66. *See* Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964).

67. *See* United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

68. *See* Aptheker v. Secretary of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964).

69. *See* NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

70. *See* Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

71. 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963).

72. 379 U.S. 536, 559, 85 S.Ct. 453, 476, 13 L.Ed.2d 471, 481 (1965).

73. 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966).

74. *E. g.,* Dombrowski v. Pfister, 380 U.S. 479, 486, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

stake. But the sort of public order that must be maintained and the nature of the governmental process which must be administered without interference will vary from situation to situation. And as they vary, so too will the sort of conduct properly subject to restriction and the places where it may be restricted.

In Edwards v. South Carolina,[75] 187 protestors were convicted for a common law breach of the peace. They had marched peacefully in groups of about 15 to the state house grounds, "an area of two city blocks open to the general public." [76] Stressing that "the circumstances in this case reflect an exercise of * * * basic constitutional rights in their most pristine and classic form," [77] the Supreme Court condemned as unconstitutionally vague a common law crime which the state court had termed "not susceptible of exact definition," [78] but which permitted punishment "upon evidence which showed no more than that the opinions which [the protestors] were peaceably expressing were sufficiently opposed to the views of the majority of the community to attract a crowd and necessitate police protection." [79]

Cox v. Louisiana came to the Supreme Court as two separate cases under the same name, both of which arose from a protest march against racial segregation. The protestors had marched to a courthouse, then stood across the street from its steps, about 100 feet away, to sing hymns. In Cox I,[80] the leader of the demonstration was convicted under state statutes directed against breaches of the peace and obstructing public passages. As for the first offense, the Court concluded that the statute was overbroad; as in Edwards, it permitted conviction "merely for peacefully expressing un-popular views." [81] As for the second offense, the Court found that statute also invalid, since it "provide[d] no standards for the determination of local officials as to which assemblies to permit or which to prohibit." [82]

In Cox II,[83] upon which the Government principally relies, the Court found constitutional on its face a statute which provided:

> Whoever, with the intent of interfering with, obstructing, or impeding the administration of justice, or with the intent of influencing any judge, juror, witness, or court officer, in the discharge of his juror duty pickets or parades in or near a building housing a court of the State of Louisiana * * * shall be fined not more than five thousand dollars or imprisoned not more than one year, or both.[84]

Mr. Justice Goldberg reasoned for the majority that the statute "prohibits a particular type of conduct, namely, picketing and parading, in a few specified locations, in or near courthouses." [85] To the appellant's contention that the failure of the statute to define "near" rendered it unconstitutionally vague, the opinion responded, after noting that the statute had been applied to a demonstration only a hundred or so feet from the courthouse,

> [The] administrative discretion to construe the term "near" concerns a limited control of the streets and other areas *in the immediate vicinity of the courthouse* and is the type of narrow discretion which this Court has recognized as the proper role of responsible officials in making determinations concerning the time, place, duration, and manner of demonstrations.[86]

---

75. 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963).

76. *Id.* at 230, 83 S.Ct. at 681.

77. *Id.* at 235, 83 S.Ct. at 683.

78. *Id.* at 234, 83 S.Ct. 680.

79. *Id.* at 237, 83 S.Ct. at 684.

80. 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965).

81. *Id.* at 551, 85 S.Ct. at 462.

82. *Id.* at 556, 85 S.Ct. at 465.

83. 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965).

84. *Id.* at 560, 85 S.Ct. at 478.

85. *Id.* at 562, 85 S.Ct. at 479.

86. *Id.* at 569, 85 S.Ct. at 483 (Emphasis added.)

Finally, Adderley v. Florida [87] upheld the convictions of 32 protest marchers who had demonstrated at a local jail Mr. Justice Black found for the majority,

> The Florida trespass statute under which these petitioners were charged cannot be challenged * * * [as overbroad]. It is aimed at conduct of one limited kind, that is, for one person or persons to trespass upon the property of another with a malicious and mischievous intent.[88]

The majority stressed particularly the requirement of intent, pointing out that the words of the statute together with the instructions given to the jury "instead of contributing to uncertainty and misunderstanding, actually makes its meaning more understandable and clear." [89] The opinion also paid particular attention to concept of property. Criticizing "the assumption that people who want to propagandize protests or views have a constitutional right to do so whenever and however they please," [90] the Court carefully distinguished the conduct involved in *Edwards* from that present in *Adderley:*

> In *Edwards*, the demonstrators went to the South Carolina State Capitol Grounds to protest. In this case they went to the jail. Traditionally, state capitol grounds are open to the public. Jails, built for security purposes, are not.[91]

## V

The Government argues that *Cox II* and *Adderley* govern this case. I cannot agree. Here, as in *Cox II*, the statute forbids protestors to "parade" or display picket signs. Section 193g, however, also makes it illegal simply to "stand" in an assemblage. More important is the absence of any requirement of intent under Section 193g. The statute in *Cox II* had as one element "the intent of interfering with, obstructing, or impeding the

administration of justice, or with the intent of influencing any judge, juror, witness, or court officer, in the discharge of his duty * * *."

It could be argued that any petition for the redress of grievances has for its object the goal of influencing someone. But *Cox II* involved a demonstration at a courthouse: traditionally, the judiciary does not decide cases by reference to public opinion. Consequently, a state may properly prohibit conduct which has for its only object "influencing" a judge or other court official by a demonstration of public sentiment.

But a legislature is quite another institution. The very concept of representative democracy requires legislators to heed the feelings of their constituents. As a result, the simple intent to "influence" Congress by an expression of public sentiment, without more, could hardly be outlawed. This leaves the "intent of interfering with, obstructing, or impeding the administration" of government. While conduct accompanied by such a goal could properly be forbidden outside legislative halls as well as across the street from a courthouse, Section 193g requires no such intent.

Section 193g can also be distinguished from the statute in *Cox II* in terms of the area where demonstrations are prohibited. The latter statute forbade only "pickets or parades in or near a building housing a court." The Supreme Court construed "near" to mean "in the immediate vicinity" of the courthouse.

Section 193g has as its province, on the other hand, the Capitol Grounds. Under 40 U.S.C. § 193a (1964), the perimeters of the grounds are determined by a map approved by the Architect of the Capitol. Without considering certain exotic outposts included on this map such as the Poplar Point Nursery, which lies across the Anacostia River, we find from this map that the Capitol Grounds

87. 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966).

88. *Id.* at 42, 87 S.Ct at 244.

89. *Id.* at 43, 87 S.Ct. at 245.

90. *Id.* at 47–48, 87 S.Ct. at 247.

91. *Id.* at 41, 87 S.Ct. at 244.

stretch some six blocks north of the Capitol itself to Union Station, some three blocks south to include the fountains beyond the House Office Building, three blocks west to the base of Capitol Hill, and a similar three blocks east to the rear of the Library of Congress annex.

This spacious greensward studded with the mansions of government certainly sweeps far beyond the "immediate vicinity" of the Capitol Building, and encompasses areas where even the loudest hosanna of protest could scarcely distract a legislator from his task of legislating.

As for *Adderley*, whatever one may think of "malicious and mischievous intent" as an element which makes a statute's meaning "more understandable and clear" to jurors, Section 193g lacks even such a shorthand reminder that some form of mens rea is required. More important, the nature of the property involved, which the Court found surpassingly important in *Adderley*, distinguishes the present controversy from that case.

Here we have not a jail "built for security purposes." Rather, we have the Capitol Grounds. And by the very words of *Adderley*, "Traditionally, * * * capitol grounds are traditionally open to the public."

Because Section 193g prohibits, without any reference to intent, all assemblages within a wide area approriate for public use and protest, I cannot conclude that *Cox II* and *Adderley* establish its constitutionality. But neither do *Edwards* and *Cox I* automatically establish its unconstitutionality—although I note that this statute forbids the expression of any views on the Capitol Grounds, which arguably renders it a notch broader than the fatally vague common law

offense in *Edwards* which permitted conviction "merely for peacefully expressing unpopular views."

To reach a sound application of the overbreadth analysis, the Court should rather measure the prohibitions of Section 193g against the legitimate governmental interests it protects, in order to decide whether the latter can justify the former. The district court concluded, "The restrictions [of the statute] are reasonable in insuring non-interference with the work of the legislature, the maintenance of free movement of tourists and visitors into and around the seat of government and protection of landscape."

While this is an appropriate cataloguing of the governmental interests to be protected, I cannot acquiesce in the conclusion. Quite simply, the statute by its language requires neither that the legislature be disrupted, the free flow of tourists disrupted nor the landscape damaged, nor even that there be an intent to achieve one of these results.

This is not an area where the evils feared are so diffuse or the possible specifics of improper conduct so manifold that precision cannot be demanded in legislation. Here, with even a modicum of craftsmanship Congress could have "tailored [the statute] * * * precisely * * * to the exact needs of the case."

In fact, it has. As amended in 1967, the statutory framework surrounding Section 193g outlaws with specificity the sort of conduct which might lead to the evils outlined by the district court. Section 193f(4) forbids "any disorderly or disruptive conduct" engaged in on the Capitol Grounds "with intent to impede, disrupt, or disturb the orderly conduct of any session of the Congress * *." [92]

---

**92.** 40 U.S.C. § 193f, as amended, provides:
  It shall be unlawful for any person or group of persons willfully and knowingly * * *
    to utter loud, threatening, or abusive language, or to engage in any disorderly

disruptive conduct, at any place upon the United States Capitol Grounds or within any of the Capitol Buildings with intent to impede, disrupt, or disturb the orderly conduct of any session of the Congress or either House thereof

Section 193f(b) (5) declares it unlawful "to obstruct, or to impede passage through or within, the * * * Capitol Grounds * * *." [93] Finally, Section 193e forbids any conduct which injures the landscape or facilities of the Capitol Grounds.[94]

The indiscriminate sweep of Section 193g stands in sore contrast to these narrowly drawn prohibitions. Congress may impose reasonable limitations upon the right of free assembly and free expression. But such restrictions must be whittled to the scale of the evil feared. The ban upon all assembly and all expression contained in Section 193g blankets protected activity as well as that which Congress may rightly prohibit. Consequently, the court should declare the statute unconstitutional upon its face.[95]

---

or the orderly conduct within any such building of any hearing before, or any deliberations of, any committee or subcommittee of the Congress or either House thereof.

Pub.L. No. 90–108, § 6(b) (4) (October 20, 1967).

See *also* 40 U.S.C. § 193f(b) (3), which provides as amended:

It shall be unlawful for any person or group of persons willfully and knowingly * * *

to enter or to remain in any room within any of the Capitol Buildings set aside or designated for the use of either House of Congress or any Member, committee, subcommittee, officer, or employee of the Congress or either House thereof with intent to disrupt the orderly conduct of official business:

Pub.L. No. 90–108, § 6(b) (3) (October 20, 1967).

93. 40 U.S.C. § 193f(b) (5), as amended, provides:

It shall be unlawful for any person or group of persons willfully and knowingly * * *

to obstruct, or to impede passage through or within, the United States Capitol Grounds or any of the Capitol Buildings;

Pub.L. No. 90–108, § 6(b) (5) (October 20, 1967).

94. 40 U.S.C. § 193e (1964) provides:

It is forbidden to step or climb upon, remove, or in any way injure any statue, seat, wall, fountain, or other erection or architectural feature, or any tree, shrub, plant, or turf in said United States Capitol Grounds.

95. The authority conferred by Sections 193j and 193k, *see supra* note 60, upon the President of the Senate and the Speaker of the House of Representatives, or in their absence the Chief of the Capitol Police, to suspend the prohibitions of Section 193g "in order to admit of the due observance * * * of occasions of national interest becoming the cognizance and entertainment of Congress" does not cure its unconstitutionally broad sweep. Section 193j scarcely provides a concrete standard to guide these officials in the exercise of the discretion entrusted to them. *See* Cox v. Louisiana, 379 U.S. 536, 557–558, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Lovell v. City of Griffin, 303 U.S. 444, 451–452, 58 S.Ct. 666, 82 L.Ed. 949 (1938). Consequently reliance upon them to prevent inappropriate applications of the statute would not be justified.