**JEANNETTE RANKIN BRIGADE et al., Plaintiffs,**

**and**

**Bella Abzug and Ronald V. Dellums, Intervenor Plaintiffs,**

**v.**

**CHIEF OF CAPITOL POLICE et al., Defendants.**

**Civ. A. No. 54–68.**

United States District Court, District of Columbia.

May 9, 1972.

William J. Bender and Morton Stavis, Newark, N. J., William Kunstler, and Arthur Kinoy, New York City, Harriet Van Tassell, Newark, N. J., Joseph Forer, Forer & Rein, Washington, D. C., Robert A. Sedler, Lexington, Ky., Peter Weisman, Washington, D. C., and Ralph J. Temple, Washington, D. C., of counsel, for plaintiffs.

Ralph J. Temple, Peter Weisman and James H. Heller, Washington, D. C., of counsel, for intervenor plaintiffs.

Harold H. Titus, Jr., U. S. Atty., Joseph M. Hannon and Gil Zimmerman, Asst. U. S. Attys., Washington, D. C., for defendants.

Before McGOWAN, and ROBINSON, Circuit Judges, and WALSH, District Judge.

McGOWAN, Circuit Judge:

The complaint before us, filed January 8, 1968, challenges the validity under the First and Fifth Amendments of 40 U.S.C. § 193g, which is one of a series of statutes regulating access to, and conduct upon, the grounds of the United States Capitol.[1] Section 193g itself reads as follows:

> It is forbidden to parade, stand, or move in processions or assemblages in said United States Capitol Grounds, or to display therein any flag, banner, or device designed or adapted to bring into public notice any party, organization, or movement, except as hereinafter provided in sections 193j and 193k of this title.

Sections 193j and 193k are set forth in the margin.[2]

1. 40 U.S.C. § 193a (1964) provides:
   The United States Capitol Grounds shall comprise all squares, reservations, streets, roadways, walks, and other areas as defined on a map entitled "Map showing areas comprising United States Capitol Grounds", dated June 25, 1946  .  .  .  .
   As indicated on such map, the Capitol Grounds comprise a large area extending north to Union Station, east to Third Street, S.E. and N.E., south to Virginia Ave., S.E., and west to Third Street, N.W. and S.W.

2. 40 U.S.C. § 193j (1964) provides:
   In order to admit of the due observance within the United States Capitol Grounds of occasions of national interest becoming the cognizance and entertainment of Congress, the President of the Senate and the Speaker of the House of Representatives, acting concurrently, are authorized to suspend for such proper occasions so much of the prohibitions contained in sections 193b–193g of this title as would prevent the use of the roads and walks of the said grounds by processions or assemblages, and the use upon them of suitable decorations, music, addresses, and ceremonies: *Provided,* That responsible officers shall have been appointed, and arrangements determined which are adequate, in the judgment of said President of the Senate and Speaker of the House of Representatives, for the maintenance of suitable order and decorum in the proceedings, and for guarding the Capitol and its grounds from injury.

   40 U.S.C. § 193k (1964) provides:
   In the absence from Washington of either of the officers designated in section 193j of this title, the authority therein given to suspend certain prohibitions of sections 193b–193g of this title shall devolve upon the other, and in the absence from Washington of both it shall devolve upon the Capitol Police Board: Provided, That notwithstanding the provisions of sections 193g and 193j of this title, the Capitol Police Board is authorized to grant the Commissioner of the District of Columbia authority to permit the use of Louisiana Avenue for any of the purposes prohibited by section 193g of this title.

Since the complaint sought declaratory and injunctive relief with respect to the enforcement of this statute, it was accompanied by a request for the convening of a three-judge court under 28 U.S.C. § 2282. This request was denied, and the complaint dismissed, as failing to present any substantial constitutional question. An appeal to the United States Court of Appeals resulted in a ruling that the complaint did present such a question, and the suit was ordered reinstated for consideration by a three-judge court. Jeannette Rankin Brigade et al. v. Chief of the Capitol Police et al., 137 U.S.App.D.C. 155, 421 F. 2d 1090 (1969).[3]

This court was accordingly convened; and the case was heard by us on cross-motions for summary judgment. The defendants, in apparent recognition that the statute in its literal terms presents serious, not to say insuperable, constitutional problems, pressed upon us for its salvation a rigorously limiting construction. Believing such action by us to be beyond the allowable bounds of judicial revision of legislative enactments, we hold that the plaintiffs are entitled to (1) a judgment declaring Section 193g, as it stands, to be irretrievably in conflict with the Bill of Rights, and (2) an injunction against its enforcement.

I

The plaintiffs in this action are Jeannette Rankin Brigade, a coalition of women against the war in Vietnam, and 58 individual women.[4] The defendants are the Chief of the Capitol Police, and the three members of the Capitol Police Board, who are responsible for the enforcement of Section 193g. On January 2, 1968, the Chief of the Capitol Police informed representatives of the plaintiffs that their march in protest of the Vietnam war planned for January 15 would be in violation of Section 193g and would not be permitted. The plaintiffs had planned to march in a body from Union Station to the East Front Plaza of the Capitol and to wait there in peaceful and orderly assembly while their representatives presented petitions to congressional leaders.

With their effort to seek relief in the District Court stymied by the dismissal of their complaint on January 9, pending the appeal of that dismissal the plaintiffs did not carry out their January 15 march as planned. Instead, they confined their assembly of some 5000 ladies on that date to Union Square, which is not within the Capitol Grounds but at the rear of the Capitol at the bottom of Capitol Hill.[5] In the presentation of that appeal, the plaintiffs asserted a continuing intention and desire to engage in protests at the Capitol in opposition to the war, but abandoned their request for immediate injunctive relief. They represented to the Court of Appeals that, if the statute were declared unconstitutional, injunctive relief based on such a declaration would thereafter be sought as needed.

3. Judge Fahy's opinion for the Court of Appeals was joined in by Judge (now Chief Justice) Burger. Chief Judge Bazelon, in dissent, was of the view that (1) the intervention of a three-judge court was not necessary, and (2) Section 193g should be declared unconstitutional on its face.

4. This court, by an order entered June 21, 1971, granted the motion of Bella Abzug and Ronald V. Dellums, members of the Congress of the United States, to intervene as plaintiffs. In view of the disposition we make of this case, no special discussion is necessary of the allegations made in their complaint in intervention.

5. The plaintiffs had theretofore been advised by the Chief of the Capitol Police that they could come upon the Capitol Grounds in groups of ten to fifteen persons, and that, as such groups, they could visit the members of Congress and present petitions. The restriction upon them was said to be that they could not march and assemble on the Capitol Grounds as one large group. They also had been told that they could use Louisiana Avenue for a mass march or assembly, although it is within the statutory definition of the Capitol Grounds. They were also told that Union Square could be so used upon obtaining a permit from the National Park Service.

Apart from its determination that the constitutional issues raised by the plaintiffs are substantial, the Court of Appeals was concerned with jurisdictional, as distinct from merits, issues. The jurisdictional issues, in addition to the substantiality question, discussed by it were three in number: (1) mootness, (2) the appropriateness of a three-judge court where there is no immediate request for injunctive relief, and (3) the immediacy and reality of a controversy necessary to the grant of declaratory relief.

With respect to mootness, the Court of Appeals concluded that, as of the time the appeal was decided by it, the case was not moot. It expressly refrained, however from "[foreclosing] the issue of mootness from consideration by the District Court as the situation may then appear." With respect to the second issue, it considered that a declaratory judgment holding Section 193g unconstitutional "would have a restraining effect comparable to injunctive relief"; [6] and that this factor, in conjunction with a purpose to seek injunctive relief as occasion should arise in the future in order to make effective a declaration of unconstitutionality, left the case in a posture appropriate for resolution by a three-judge court. The third jurisdictional issue was not resolved by the Court of Appeals for the reason that it thought that the requisite immediacy and reality of plaintiffs' grievances should be determined initially by the District Court "on the basis of the situation which is shown to exist at the time of the hearing on the remand."

The record before us on remand contains, in addition to the complaint which was before the Court of Appeals, the subsequent cross-motions for summary judgment and the supporting statements of undisputed facts. The cross-motions also have attached to them a variety of affidavits and exhibits. It is by reference to this record that we address ourselves to the jurisdictional issues.

## II

### 1. Mootness

At the time the Court of Appeals considered this issue, it was known to that court that Jeannette Rankin Brigade was no longer in existence, and that the individual plaintiffs disclaimed any specific and immediate plans for a demonstration or any purpose to ask for present injunctive relief. In holding the matter not moot, the court relied upon the allegations in the complaint that the claimed rights would be reasserted from time to time in the future, and that injunctive relief would be sought again if necessary. The court noted that, in any such event, "the availability of timely judicial action to avoid interference cannot be predicted." It characterized the rights in question as "imbedded in the Constitution . . . [and] of a continuing character;" and it added that "the Vietnam problem remains." Jeannette Rankin Brigade, supra, 137 U.S. App.D.C. at 157, 421 F.2d at 1092.

The record on remand offers no change in these respects, and we find no warrant for reaching a different result than did the Court of Appeals. Nothing has happened in respect of plaintiffs' purpose to assert their claimed rights which alters that court's description of "the controversy initiated by [plaintiffs]" as being "of a continuous character," and one not mooted by reason of periodic lulls in plaintiffs' activities. See Southern Pacific Terminal Co. v. I. C. C., 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911); Carroll v. President and Commissioners of Princess Anne County, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968).

One thing is new. The defendants, in contrast with their position in the Court of Appeals, now agree with plaintiffs that the case is not moot. This change

---

6. Jeannette Rankin Brigade v. Chief of the Capitol Police et al., 137 U.S.App. D.C. 155, 159, 421 F.2d 1090, 1094

(1969). See also Samuels v. Mackell, 401 U.S. 66, 73, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971).

of position appears to derive principally from the fact that on June 19, 1969— one day before the Court of Appeals opinion issued—Chief Judge Greene, of the then D. C. Court of General Sessions, construed Section 193g in United States v. Nicholson (Crim. No. 20210–69a, Memorandum Opinion, affirmed, 263 A. 2d 56 (D.C.C.A.1970)). In that case, the Court of General Sessions interpreted the prohibitions of the statute limited to

> the imposition of criminal punishments for acts or conduct which interferes with the orderly processes of Congress, or with the safety of individual legislators, staff members, visitors or tourists, or their right to be free from intimidation, undue pressure, noise or inconvenience. . . .

It is appropriate, therefore, under the statute, to bar or order from the Capitol, any group which is noisy, violent, armed, or disorderly in behavior, any group which has a purpose to interfere with the processes of Congress, any member of Congress, congressional employee, visitor or tourist; and any group which damages any part of the building, shrubbery, or plant life.

The defendants assure us that, although they emphatically disagree with the *Nicholson* interpretation, they have, in deference to a principle which they characterize as the rule of law, adhered to it in their enforcement policies. Thus, to the extent that this is so, there has arguably been removed any threat to, or restraint upon, the peaceful demonstrations which are the only kind the plaintiffs allege they wish to engage in.

Section 193g has, however, a peculiar duality. It appears both in the United States Code and the District of Columbia Code; and violations of it may be prosecuted either in the local District of Columbia courts or in the federal district court for the District of Columbia.[7] Thus, the construction of the statute by the local courts has no binding effect on the federal courts if the Government elects to prosecute violations here.[8] Nor is the Government's concededly reluctant present purpose to abide by the *Nicholson* construction binding upon itself. That construction, thus, cannot be considered as effectively removing any

---

7. 40 U.S.C. § 193h provides:
   (c) Violations of sections 193a–193m, 212a and 212b of this title . . . shall be prosecuted by the United States attorney or his assistants in the name of the United States. . . . Prosecution for any violation of section 193f (a) of this title . . . shall be in the United States District Court for the District of Columbia. All other prosecutions for violations of sections 193a–193m, 212a and 212b of this title *may* be in the District of Columbia Court of General Sessions. . . . (Emphasis supplied.)

8. There is no analogy, therefore, to the situation where a federal three-judge court is asked to enjoin the operation of a *state* statute under 28 U.S.C. § 2281, in which case the construction of the state statute by the state court would be binding on the federal court. *See* Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970); Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Nor does the fact that the District of Columbia Court

Reform and Criminal Procedure Act of 1970, Pub.L. No. 91–358, 84 Stat. 473, gives local District of Columbia courts many of the attributes of state courts change this conclusion, since the Capitol Grounds Statute remains in both codes and may still be enforced in both court systems. If this statute were only a local District of Columbia statute, then this court might conceivably be bound by the local court's construction of it, and would be limited to the question of whether the statute *as so construed* was constitutional.

Since the statute is federal law as well, this court has power to consider its constitutionality according to its own view of the meaning of the statute. It can adopt its own construction of the statute, if possible and necessary to avoid finding it constitutionally defective. If this court were to find the statute constitutional without adopting a restrictive construction, there would be presented the question of whether its holding was binding on the District of Columbia courts, or whether they would be free to follow their own restrictive construction.

threat or restraint upon the plaintiffs' proposed activities, especially since the Government has aggravated the plaintiffs' uncertainty by asserting that its adherence to the *Nicholson* construction is "only in the interim between that ruling and the time (this three-judge court) rules on the matter." The controversy, therefore, has not been mooted by the supervening events centering around *Nicholson*.

## 2. *The Need for Injunctive Relief*

At the oral argument before us on the cross-motions, the plaintiffs took the same position as they did in the Court of Appeals, that is to say, they represented that they were not presently seeking injunctive relief, but that they might have occasion to do so in the future upon the basis of the declaratory judgment which they ask this court to issue. In a post-hearing memorandum, however, the plaintiffs have renewed their original prayer for present injunctive relief to accompany a declaration of the unconstitutionality of Section 193g. This change of position is described as founded upon fears of arrest flowing from widespread prosecutions of recent demonstrators other than themselves. The Government, seizing upon this renewed request for injunctive relief, asserts that there can no longer be any question that the precise terms of 28 U. S.C. § 2282 are met, and that this three-judge court has jurisdiction.

The Court of Appeals did not, at least in the circumstances of this case, regard a present request for injunctive relief as essential to three-judge court jurisdiction; and it would presumably regard the plaintiffs' latest position on injunctive relief as an *a fortiori* indication of the applicability of Section 2282. Our own view is that there are no new circumstances appearing in the record before us to justify our disregard of even the narrower basis of the position of the Court of Appeals in this regard; and that the advent of *Nicholson* does not, for the reasons stated hereinabove in connection with mootness, undermine the

direction to us from the Court of Appeals that we have jurisdiction even though we may in fact choose to exercise it only to the extent of declaring Section 193g to be unconstitutional. *See* Milky Way Productions v. Leary, 305 F. Supp. 288 (S.D.N.Y.1969), aff'd, New York Feed Co. v. Leary, 397 U.S. 98, 90 S.Ct. 817, 25 L.Ed.2d 78 (1970).

## 3. *The Propriety of Declaratory Relief*

The Court of Appeals thought it appropriate to call our attention to the discretionary character of the power to issue declaratory judgments, and also to the necessity that that power not be exercised in factual situations which lack the immediacy and reality requisite to constitute live controversies within the meaning of Article III of the Constitution. We were admonished to look to these matters in the context of the record before us. We have done so, and we have concluded that, for purposes of a prospect of declaratory relief adequate to support our jurisdiction, the controversy before us is an ongoing and vigorous one.

The Government, sharing the plaintiffs' belief that jurisdiction resides in this court to determine the merits, presses this concept upon us most emphatically. Its moving papers represent that the *Nicholson* construction has placed the law enforcement authorities under great handicaps in maintaining the serenity and orderliness of the Capitol Grounds, and it beseeches us to take this occasion to put an end to that reading of Section 193g by the local courts.

The plaintiffs also profess dissatisfaction with the *Nicholson* construction, although for quite different reasons. They say it contains words which perpetuate the unacceptable degree of vagueness and overbreadth which, in their view, stigmatizes the statute. Both the plaintiffs and defendants claim that that construction has created great confusion and uncertainty. Furthermore, the plaintiffs allege that they and others have been restrained in the exercise of their rights by arrests and

threats of enforcement of the statute without regard to *Nicholson.*

■ We are satisfied from the papers before us that there is a genuine controversy over the right of plaintiffs to parade and assemble on the Capitol Grounds, even though those activities be completely peaceful in nature. It is the Government's apparent theory that repose and orderliness are inherently incompatible with the assembly of large numbers of persons, and that Congress can justifiably place numerical limitations even upon groups of citizens who have no purpose to do other than conduct themselves in an orderly fashion. The Government argues that Congress has done this in Section 193g, although its failure to leave any visible room in that statute for groups of *any* size necessitates a judicial construction of the statute in order to remove its constitutional vulnerability.

■ That saving construction, in the Government's submission, should be that individual groups of up to 15 persons may come upon the Capitol Grounds for the purpose of presenting petitions and of signifying their views. If the plaintiffs appear on the Capitol Grounds in a larger group than 15, they will be arrested, no matter how quiet and peaceful their demeanor. There is no question but that plaintiffs intend to make such appearances from time to time in the future. Thus there appear to be present here both the immediacy and the reality of a controversy over the validity of Section 193g which properly invoke the exercise of judicial power.[9]

### III

■ In addressing the merits, we first take note of the nature of the constitutional objections advanced by the plaintiffs to Section 193g. These are stated in terms of both vagueness and overbreadth with respect to 193g itself, and of the associated dangers of selective enforcement which are said to inhere in the allegedly standardless delegation of power to certain individuals to relax its prohibitions, contained in Sections 193g and 193k, note 1, *supra.* Vagueness and overbreadth, although related are separate concepts having their immediate foundations in the Fifth Amendment due process clause. The First Amendment has its own force, however, independently of due process concepts such as vagueness and overbreadth. A statute which directly impinges upon rights granted in that Amendment may be found constitutionally defective without resort to due process formulations. We think that is the case here, although the result we reach would also be compelled by due process considerations of overbreadth.[10]

9. *Compare* Boyle v. Landry, 401 U.S. 77, 81, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971). The only other possible jurisdictional impediment involves the question of whether this statute is a purely "local ordinance," which the Supreme Court has held beyond the power of three-judge courts to enjoin. *See* Moody v. Flowers, 387 U.S. 97, 101, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967); Currie, Three Judge Courts in Constitutional Litigation, 32 U.Chi.L.Rev. 1, 34 n. 14 (1964). The Court of Appeals, *Jeannette Rankin, supra* note 6 at 1093, n. 3, has held that, although limited geographically, a statute relating to the national legislature is clearly not "local" in scope. Moreover, the Supreme Court has expressly held that Acts of Congress pertaining to the District of Columbia are Acts of Congress within the meaning of 28 U.S.C. § 2282. Shapiro v. Thompson,

394 U.S. 618, 625, n. 4, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). Nothing in the District of Columbia Court Reform and Criminal Procedure Act of 1970, *supra* note 7, changes this result. District of Columbia statutes are still Acts of Congress. *See* Williams, District of Columbia Court Reorganization, 1970, 59 Geo.L.J. 483, 494, 495 (1971).

10. Whether a statute is, for example, defective for overbreadth or simply for directly infringing First Amendment rights may largely be academic. Any statute which abridges constitutional rights is, in a sense, overbroad, no matter how narrow its scope. The term "overbroad" usually applies to statutes which do not discriminate between legal and illegal activity, *see* Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct.

■ There is no ambiguity about the language of Section 193g. It tells the citizen that it is unlawful for him "to parade, stand, or move in processions or assemblages" in the Capitol Grounds, except as he has been expressly authorized to do so by a representative of Congress "[I]n order to admit of the due observance . . . of occasions of national interest becoming the cognizance and entertainment of Congress . . ." The statute on its face presents two questions: First, whether there is *any* right to assemble in the Capitol Grounds, and second, if there is such a right, to what extent may it be restricted in the light of competing governmental interests.

With regard to the former, the Supreme Court has held that there are some areas in which the Government may absolutely prohibit the exercise of First Amendment rights, especially the right to assemble.[11] Jails, for instance, may be put off limits to parades and other political demonstrations. Adderly v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966). The area surrounding a courthouse may be similarly immunized. Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) ("Cox II"). Libraries, schools, and hospitals have been occasionally referred to by the Supreme Court as other areas which the state may shield from the clamor of political demonstrations. *See*

Gregory v. Chicago, 394 U.S. 111, 89 S. Ct. 946, 22 L.Ed.2d 134 (Black, J., concurring at 118) (1969). Wildlife sanctuaries, botanical gardens, and similar recreational facilities are probably still others.

■ On the other hand, not all public property may be made so immune. Although there have been some expressions of uncertainty on this point, *see* Cox v. Louisiana, 379 U.S. 536, 555 and n. 13, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) ("Cox I"), the principle was firmly established in Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 315, 320, 88 S. Ct. 1601, 20 L.Ed.2d 603 (1967), that

. . . streets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights *cannot constitutionally be denied broadly and absolutely.* . . . Where property is not ordinarily open to the public, this Court has held that access to it for the purpose of exercising First Amendment rights may be denied altogether. (Emphasis supplied.)

Whether the Capitol Grounds is an area to which access cannot be denied broadly or absolutely depends, as the cases indicate, on whether it has been ordinarily open to the public, *Amalgamated Food*

675, 17 L.Ed.2d 629 (1967); United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); Street v. New York, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969); Coates v. City of Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), and has operative significance when the activities in question are not protected by the Constitution, although they may not be punished under a statute which would be unconstitutional if applied to someone else. *See* Coates v. City of Cincinnati, 402 U.S. at 616, 91 S.Ct. 1686.

We find it unnecessary to reach the plaintiffs' additional claims that the terms of the statute are so imprecise as to violate due process of law, or that, *if* the prohibitions of the statute were constitutional in light of compelling gov-

ernmental interests, the discretion vested by 40 U.S.C. 193j in certain authorities is so excessive as to violate constitutional standards.

11. The right to prohibit pure speech is generally regarded as more limited than the right to ban such conduct as assembling or parading, Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 313, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1967) and cases cited therein, but there is general agreement that even speech may be banned in certain contexts. As Justice Goldberg indicated in Cox v. Louisiana, 379 U.S. 536, 554, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), no one would contend that a man had a right to make a speech in the middle of Times Square during rush hour.

*Employees, supra,* or whether, as the Court implied in *Adderly, supra,* the uses for which it has traditionally been put are inconsistent with demonstrations and mass assemblies.

The Capitol Grounds (excluding such places as the Senate and House floors, committee rooms, etc.) have traditionally been open to the public; indeed, thousands of people visit them each year. Thus we cannot agree with the defendants that the Capitol Grounds have ever been characterized by the serenity and quiet of a hospital or library.

Nor is the primary purpose for which the Capitol was designed—legislating—incompatible with the existence of all parades, assemblages, or processions which may take place on the grounds. In *Cox II, supra,* the Supreme Court upheld a state statute which banned parades and picketing "in or near courthouses" which have the "intent of interfering with, obstructing, or impeding the administration of justice, or . . . the intent of influencing any judge [or] juror. . . ." The Court felt that the integrity of the judicial process could not survive in an atmosphere of mob excitement. But while, as Judge Bazelon said (dissenting in *Jeannette Rankin, supra*), "traditionally, the judiciary does not decide cases by reference to popular opinion," the fundamental function of a legislature in a democratic society assumes accessibility to such opinion. Moreover, the Capitol Grounds defined in this statute are so extensive that demonstrations which may take place upon them might not be "near" or "in the immediate vicinity of" the Capitol itself. More to the point here, therefore, than *Cox II* is Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963) where the Court held unconstitutional a breach of the peace conviction of civil rights demonstrators who were demonstrating on the grounds of the state legislature—an activity which the Court viewed as "an exercise . . . of these basic constitutional rights in their most pristine and classic form."

■ *Edwards* thus indicates that demonstrations on or near legislative grounds fall within the protections of the First Amendment. To say that the Capitol Grounds may not be wholly immune from demonstrations does not end the inquiry, however. Even in areas clearly "public" it has long been settled that governments may reasonably regulate the times, places, and manner in which the rights of free speech, assembly, and petition are exercised. *See Cox I, supra,* at 554, 85 S.Ct. 453 and cases cited therein. States may even require permits for parades and demonstrations so that the police may deal with potential traffic problems. Cox v. New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941); Poulos v. New Hampshire, 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105 (1953). Moreover, the Court has held that picketing, parading, and assembling are subject to greater degrees of regulation than "pure speech." *See* Amalgamated Food Employees, *supra,* 391 U.S. at 313, 88 S.Ct. 1601 and cases cited therein. On the other hand, the rights to free speech and assembly may not be abridged in the guise of regulation, and the state interest which may supersede these rights must "[rise] far above public inconvenience, annoyance, or unrest. . . . There is no room under our Constitution for a more restrictive view." Terminiello v. City of Chicago, 337 U.S. 1, 4, 5, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949).

■ The cases indicate that the Supreme Court uses a balancing test, weighing the particular First Amendment rights asserted against countervailing state interests. The formula for expression which is accompanied by conduct has been perhaps best articulated in United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), where the Court held that the restrictions on expression are valid if (1) the "[regulation] furthers an important or substantial governmental interest," (2) the "governmental interest is unrelated to the suppression of free expression," and (3) the incidental re-

striction on alleged First Amendment rights is no greater than is essential to the furtherance of that interest. Many substantial governmental interests *may* be jeopardized by mass demonstrations on the Capitol Grounds, including damage to buildings and grounds, obstruction of passageways, and even dangers to legislators and staff. But the terms of § 193g flatly prohibit all assemblages, whether or not they threaten those interests. Such a prohibition is hardly in keeping with the principle that statutes

> "in the area of First Amendment rights must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order. In this sensitive field, the State may not employ 'means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.'" Carroll v. President & Comm'rs of Princess Anne County, 393 U.S. 175, 183, 89 S.Ct. 347, 353, 21 L.Ed.2d 325 (1968).

The only governmental interests that the Government has cited which would justify excluding all demonstrations are the "peace," "serenity," "majesty," maintenance of a "park-like setting," and the "glorification of a form of government through visual enhancement of its public buildings." Ranged against these "interests" is the right to assemble and to petition for the redress of grievances. The First Amendment in its terms is plain:

> Congress shall make no law . . . abridging . . . the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

The desire of Congress, if such there be, to function in the "serenity" of a "park-like setting" is fundamentally at odds with the principles of the First Amendment, whose "function . . . under our system of government is to invite dispute," and which "may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." Terminiello v. Chicago, *supra*, 337 U.S. at 4, 69 S.Ct. at 896.[12]

In conclusion, it is difficult to imagine a statute which could more plainly violate the principle that "First Amendment freedoms need breathing space to survive [and] government may regulate in the area only with narrow specificity." N. A. A. C. P. v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963). While some substantial governmental interests in the Capitol Grounds may warrant protection, none have been alleged which are sufficiently substantial to override the fundamental right to petition "in its classic form" and to justify a blanket prohibition of all assemblies, no matter how peaceful and orderly, anywhere on the Capitol Grounds.

### IV

Just as there has been no controversy between the parties before us on the issues of mootness and jurisdiction, so have the defendants made no effort to deny the vulnerability of Section 193g, read literally, to constitutional challenge. What they have pressed upon us with the utmost vigor are the propositions that (1) Congress does have the power,

12. The Government, arguing that precedents clearly establish the right of a legislature to prevent nearby demonstrations, cites an English statute from the time of George III "forbidding the assembly of 'any meeting consisting of more than fifty persons within a mile from the gate of Westminster Hall'". Aside from the fact that the time of that monarch's reign was characterized by both royal and parliamentary restrictions giving rise to our Bill of Rights, the statute in question was at least a legislative, as distinct from a judicial, determination of the number of people who could safely approach the law-making chamber.

consistently with the Constitution, to make reasonable provision for regulating the use of, and the conditions of access to, the Capitol Grounds, and (2) such provision may validly comprehend numerical restrictions upon the assemblages or persons upon those Grounds. Whatever the merit of these principles, they are tangential to the issue with which we have been dealing thus far in this opinion, namely, the constitutional propriety of Section 193g as it stands.

The local courts of the District of Columbia have, as noted hereinabove, felt unable to recognize that propriety without putting a substantial gloss upon Section 193g by an expansive interpretation of its terms. The defendants have recoiled from this particular escape hatch and implore us not to make the same error. That error, however, appears to be, in their view, not that the statute has, under the guise of judicial interpretation, been amended and the legislative purpose perverted, but rather that the amendment in question is not the one the defendants prefer as the way out of their constitutional dilemma.

It is the Government's submission to us that Section 193g should not be read literally as forbidding all assemblages, but that it should be taken as providing that there may be no assemblages larger than 15 in number. In its brief the Government graphically makes this point by quoting the statute with words (to be interpolated by us) in brackets, i. e., ". . . to stand . . . in processions or assemblages [of more than fifteen persons]." [13] Without such judicial emendations, so the Government forcefully argues, the present language of the statute is open to absurdities which Congress cannot be taken to have intended. Moreover, such a reading would make it possible for groups like the plaintiffs to approach the Capitol in groups of 15 for the purpose of presenting petitions for the redress of grievances or even of being photographed with their Congressman.

We do not, of course, make light of the problems and perplexities which the flatly prohibitory language of Section 193g creates for police and prosecutor. They bear the burden of trying to enforce and sustain a statute which, however unremarkable it may have appeared to be in 1882 when it was first enacted, fairly bristles with difficulties when it is sought to be enforced 90 years later. These problems were presumably what prompted the then United States Attorney, appearing in 1967 at committee hearings, to warn the Congress that this statute was in trouble, and to make a proposal for its revision.[14]

13. Similarly, the Government would have us construe the statutory phrase "flag, banner, or device" to include picket signs, placards, and billboards, but not lapel buttons, name cards, insignias, or armbands. While, like its "fifteen persons" construction, this view may suit the Government's purpose, it finds no support in either the legislative history or other sections of the statute.

14. Mr. David Bress, then United States Attorney for the District of Columbia, testified quite candidly that Section 193g as written

"presents a problem. . . . I believe that in the First Amendment area this does present a problem. . . . The indications are that reasonable regulations even-handedly enforced as a regulatory measure over the area adjacent to a legislative assembly would be valid under recent Supreme Court decisions, but that is different from providing for an outright abolition without any regulatory steps."

See Hearings Before the Subcommittee on Public Works of the Senate, 90th Congress, 1st Session. The proposed amendment to 193g would have abolished the absolute prohibition and merely substituted the requirement that organizations notify the Chief of the Capitol Police five days prior to any parade or demonstration. The Committee rejected this proposal over the dissents of Senators Gruening, Cooper, and Young, in whose view the statute as written was plainly unconstitutional. See Senate Report No. 573, 90th Congress, 1st Session.

Although Congress at that time amended and enlarged other sections of the Capitol Grounds statutes of which Section 193g is a part, it left the language of that section unchanged—a decision which can only be regarded as a consciously deliberate one in view of the representations made to it about the need for change. The only inference logically to be drawn from this is that Congress reaffirmed its 1882 purpose to forbid all demonstrative assemblages of any size, no matter how peaceful their purpose or orderly their conduct.[15] A statute of that character is void on its face on both First and Fifth Amendment grounds; and we so declare this one to be.

■■■ There are, of course, occasions when courts, by limiting constructions placed upon the words of a statute, are able to turn back constitutional attack. *See, e. g.*, United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965); Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). But there are bounds beyond which it is not appropriate for courts to go in this regard, at least without exposing themselves to the charge that they are usurping the legislative function. See Aptheker v. Secretary of State, 378 U.S. 500, 515, 516, 84 S.Ct. 1659, 12 L. Ed.2d 992 (1964). Although we are not unsympathetic with the reasons which prompt the United States Attorney to ask us to rewrite a curiously inept and ill-conceived Congressional enactment, we think that is a function more appropriately to be performed by Congress itself.

In the first place, the regulation of public access to the Capitol Grounds is a question of peculiar interest and importance to the Congress. We are not informed with respect to either the general objectives to be achieved by such regulation or the manifold special problems which must be accommodated. Secondly, we have no basis for concluding, as the defendants would have us do, that numerical limitations are the best way to achieve the Congressional purposes, or, if they are, what the exact numbers should be. These are issues best to be resolved by the legislative machinery of investigation and hearing, directed to proposals formulated by draftsmen who are both close to the facts and cognizant of the relevant legislative objectives. Indeed, we can scarcely conceive of a situation, so closely touching upon the immediate concerns of the Congress itself, where the intrusion of judicial prescription into the law-making process would be more out of keeping with the concepts embodied in the separation of powers.

In declining to save this statute by the means suggested by the Government, we do not consider that Congress is threatened with a state of anarchy until it can devise its own plan for the admission of the public to the Capitol Grounds. Those who presently go upon the Capitol Grounds, either singly or in groups, are subject to other sections of the existing laws regulating conduct within the Capitol Grounds which forbid (1) public travel on or occupancy of any area other than "roads, walks, and places prepared for that purpose by flagging, paving, or otherwise," (2) obstructing any roads or "hindering their proper use", (3) persons to "step or climb upon, remove, or in any way injure any statue, seat, wall, fountain, . . . tree, shrub, plant, or turf," (4) carrying "any firearm, dangerous weapon, explosive, or incendiary device", (5) entering or remaining on the floor of either House, or gallery in violation of any rules, or any room "with intent to disrupt the orderly conduct of official business", (6) uttering "loud, threatening, or abusive language, or (engaging) in any disorderly or disruptive conduct" anywhere on the

---

15. *See* dissenting opinion of Chief Judge Bazelon, *Jeannette Rankin Brigade, supra* note 6, 137 U.S.App.D.C. at 167, 421 F.2d at 1102, where he observed,

" . . . [A] narrower construction finds no support in this recent manifestation of legislative will."

Grounds "with intent to impede, disrupt, or disturb the orderly conduct of any session of the Congress", (7) engaging in any act of physical violence, and (8) parading, demonstrating, or picketing within any of the Capitol buildings.[16]

While minute scrutiny may perhaps suggest that these provisions perhaps may not cover every conceivable contingency incompatible with good order, they hardly constitute the "statutory vacuum" which the Superior Court in *Nicholson* purported to fear, and which caused it elaborately to construe Section 193g to provide comparable protections. There is nothing in the prohibitions of § 193g which that construction preserved which is not also prohibited by other provisions of the Capital Grounds laws. The coexistence of § 193g with these prohibitions can, in reason, only imply that Congress must be taken, by the language it has used, to intend to prohibit absolutely assemblages which do not violate any of the more specific provisions. That purpose the Constitution does not countenance.

### V

There remains the matter of the relief to be given at this time. As the foregoing reveals, although the plaintiffs have been back and forth on the question of immediate injunctive relief, their latest statement on the subject embodies a request that it be afforded. We have noted above (p. 580) the representation of defendants to this court that they propose to respect the *Nicholson* construction only until we rule. Under these circumstances, although our jurisdiction does not depend upon a grant of injunctive relief, the judgment we propose to enter will, in addition to declaring Section 193g to be void on its face because of the constitutional infirmities exposed hereinbefore, permanently enjoin the defendants from enforcing Section 193g.

16. See 40 U.S.C. §§ 193b–193f (1970).